Filed 3/3/16  P. v. Gutierrez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE JUAN GUTIERREZ et al.,<br><br>    Defendants and Appellants. | B250333<br><br>(Los Angeles County<br>Super. Ct. No. BA388274) |

APPEAL from judgments of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant Jose Juan Gutierrez.

Carlo Andreani for Defendant and Appellant Gerardo Jacobo.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Myoshi and Nima Razfar, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Jose Juan Gutierrez and Gerardo Jacobo, raise various claims following their convictions of premeditated attempted murder, assault with a deadly weapon, assault with a semi-automatic firearm (Gutierrez only) and misdemeanor assault (Jacobo only), with gang and firearm enhancement findings. For the reasons discussed below, the judgments are affirmed.

## BACKGROUND

Viewed in accordance with the usual rules of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *The shooting*.

Defendants Gutierrez and Jacobo were members of the City Terrace gang, whose main rival was the Geraghty Lomas gang. On August 7, 2011, at about 1:30 a.m., Martha G. drove her van to Duke's liquor store. Martha's passengers included her husband Joel, her stepson Santiago, and Santiago's friend, Ernie. The liquor store was within territory claimed by the Geraghty Lomas gang. Ernie and Santiago went into the store to buy beer while Martha and Joel waited in the van. Santiago was walking with a crutch.

Just after Ernie and Santiago entered the liquor store, a pickup truck pulled up and parked at the front entrance. Jacobo got out of the truck and went into the liquor store, where he appeared to exchange words with either Ernie or Santiago, or both of them.[1] Jacobo made his purchase and left the store. Immediately afterward, Santiago and Ernie completed their purchase and left the store. As they were walking out the front entrance, Jacobo was sitting in the truck's front passenger seat and was in the act of pulling the truck door closed. Santiago gestured toward Jacobo and appeared to say something to him. In response, Jacobo and Gutierrez (who was sitting in the rear passenger seat) immediately got out of the truck.

---

[1]    Much of the evidence at trial came from video surveillance cameras that were mounted in and around the liquor store. The jury was shown a series of video clips of what occurred inside and outside the store during the incident. We have viewed the video clips, which do not have sound.

2

Initially, Jacobo and Gutierrez both approached Santiago, who was standing just a few steps away. Jacobo punched Santiago in the face and grabbed his crutch. Santiago began running down the sidewalk in the direction of Martha's van. Meanwhile, Gutierrez turned and approached Ernie, who had been standing slightly behind Santiago. Gutierrez swung at Ernie's head with a handgun and kicked him. Ernie fell to the ground. Gutierrez kicked Ernie again and then joined Jacobo in chasing Santiago down the sidewalk. With Gutierrez running right behind him, Jacobo chased Santiago while swinging the crutch at him. As the three men were running down the sidewalk, Joel got out of Martha's van and joined the fray in an effort to protect Santiago. The melee spilled over into an intersection. Joel and Gutierrez apparently began to fight and then Gutierrez fired his gun six times at Joel, hitting him twice.[2] Joel ran back to the van, which sped off. Jacobo and Gutierrez returned to the pickup truck and the driver sped off.

Martha testified that she was sitting in the van talking to Joel when the fight broke out. She watched Santiago and Ernie leave the liquor store, and she saw the defendants attack them. When Joel got out of the van to help Santiago, he began fighting with Gutierrez. Martha saw Gutierrez shoot at Joel five or six times. Joel ran back to the van and said he had been shot. Martha drove off, leaving Ernie behind. She drove Joel to the hospital where he was treated for gunshot wounds to his leg and hip. According to Martha, neither Joel, Santiago nor Ernie were armed that night.

Alfonso E. was working at Duke's liquor store that night and he recognized Ernie as a regular customer. Alfonso saw Jacobo walk in, approach Ernie and exchange words with him. Jacobo said, "Where are you [from]? This is City Terrace." Alfonso testified

---

**2** On the videotape, Martha's van is partially obscured from view by some fencing and Joel cannot be seen getting out of the van. However, a fourth figure suddenly comes into view in the intersection. The gunshots cannot be seen on the videotape. Because Ernie remained close to the liquor store entrance after being attacked by Gutierrez, it is apparent that Joel must be the fourth figure on the videotape. Joel was subsequently deported to Mexico and he did not testify at trial. Neither Santiago nor Ernie testified at trial.

3

that Ernie replied by saying, "That's cool. No problem." However, when Alfonso was interviewed by the police, he told them that Ernie had responded: "This is Geraghty." Moments after Ernie and Santiago left the store, Alfonso heard gunfire.

The police found six expended .380-caliber shell casings in the street, five or six car lengths from Duke's liquor store.

2. *The gang evidence*.

Detective Eduardo Aguirre testified as the prosecution's gang expert. He was familiar with the City Terrace gang, whose primary activities included murders, shootings, robberies, drug sales, possession of handguns, burglaries, vandalism, and stealing cars. Duke's liquor store is located at the north end of territory belonging to the Geraghty Lomas gang, about a quarter mile from the border with City Terrace territory. Geraghty Lomas is City Terrace's main rival. Their contiguous border was a source of tension between the two gangs.

Aguirre testified it would constitute a sign of disrespect for a gang member to venture into a rival gang's territory. When a gang member "hits up" a potential rival by inquiring where he is from, this is a confrontational challenge (the speaker is asking the other person to reveal his gang affiliation) that is considered a provocation and can lead to a physical assault or a shooting if the person answers with the name of a rival gang. It is an accepted part of gang culture that a gang member must take some form of action when confronted by a rival. Backing down from a potential confrontation is frowned upon, and a gang member who did so would not only lose respect, but could possibly be ejected from the gang, assaulted, or killed. Aguirre explained that "if a gang member is disrespected out in the street, what you're supposed to do, you're supposed to act on it with some sort of violence."

Aguirre testified that gang members pass guns around among themselves and store them in safe places having no known ties to the gang. It is common for gang members to stay armed even when they are just out socializing with friends. Gang members make it a point to know whether fellow members of their gang are armed; this is "for their own protection, and in order to go and commit crimes."

4

Aguirre testified that both defendants were members of the City Terrace gang. Jacobo, who was 31 or 32 years old, had been a member since he was 15. Jacobo had personally admitted his membership to Aguirre. Gutierrez, who was younger, had been a member of the City Terrace gang for only four or five years. It was stipulated that Gutierrez was a member of City Terrace on the night Joel was shot.

Asked a hypothetical question based on the evidence in this case, Aguirre opined that the shooting had been committed for the benefit of the City Terrace gang. Following the hostile encounter inside the liquor store, Jacobo was just getting back into the truck when Santiago walked by and apparently said something provocative: "That showed an outright disrespect to the older gang member [i.e., Jacobo], as well as to the younger gang member [i.e., Gutierrez] in the car. And at that point, both City Terrace gang members had no choice but to act and either assault, shoot or kill the persons that disrespected them."

3. *The trial outcome.*

The jury convicted both Jacobo and Gutierrez of premeditated attempted murder and assault with a deadly weapon. (Pen. Code, §§ 664, 187, 245, subd. (a)(1).)[3] Gutierrez alone was convicted of assault with a semi-automatic firearm (§ 245, subd. (b)), and Jacobo alone was convicted of misdemeanor assault (§§ 240, 241). In addition, gang and firearm enhancement allegations were found true as to each defendant (§§ 186.22, subd. (b), 12022.5, 12022.53).

## CONTENTIONS

Defendants raise the following contentions: (1) this court should review the sealed transcripts relating to the prosecution's assertion of a governmental evidentiary privilege; (2) there was insufficient evidence to support Gutierrez's assault with a deadly weapon conviction; (3) there was insufficient evidence to support Jacobo's premeditated attempted murder conviction; (4) the trial court erred by allowing the prosecution gang expert to give certain testimony; (5) the trial court erred by refusing to instruct the jury on

---

[3] All further statutory references are to the Penal Code unless otherwise specified.

5

the defense of voluntary intoxication as to Jacobo; (6) the trial court erroneously refused to give an attempted involuntary manslaughter instruction; (7) the trial court erroneously refused to give an attempted voluntary manslaughter instruction.

1. *Trial court properly upheld prosecution's asserted evidentiary privilege.*

The defendants ask us to determine whether the trial court properly upheld the prosecution's assertion of an evidentiary privilege relating to Detective Aguirre's gang expert testimony. We find that the trial court properly upheld the privilege.

After Aguirre testified that gang members typically know which other gang members have guns in their possession, defense counsel asked for the names of informants who had given Aguirre this information. Aguirre refused to answer, asserting a governmental privilege, pursuant to Evidence Code section 1041. Aguirre also asserted a governmental privilege pursuant to Evidence Code section 1040 when asked about his utilization of the Cal Gangs computer database during his investigation of this case. After two in camera hearings, the trial court ruled that Detective Aguirre had properly asserted privilege as to both inquiries. The court concluded the information was not material because there was no reasonable probability it would lead to any exculpatory evidence, and that there was a legitimate concern for the informant's safety.

The parties assert that, on appeal, this court should resolve the issue by reviewing the transcripts of the in camera hearings. We agree that this is the correct procedure.

Detective Aguirre asserted two different, but related, evidentiary privileges: the official information privilege (Evid. Code, § 1040) and the confidential informant privilege (Evid. Code, § 1041). "Under [Evidence Code] section 1040, a public entity has a privilege to refuse to disclose official information and to prevent another from disclosing it if disclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure. [Citation.]" (*Torres v. Superior Court* (2000) 80 Cal.App.4th 867, 872.) "The common law privilege for an informant's identity has been codified in Evidence Code section 1041. [Citation.] Section 1041 provides, in relevant part: '[A] public entity has a privilege to refuse to disclose the identity of a person who has

6

furnished information [in confidence to a law enforcement officer] . . . purporting to disclose a violation of a law of the United States or of this state or of a public entity in this state . . . if . . . (2) Disclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of his identity that outweighs the necessity for disclosure in the interest of justice; . . .' " (*People v. Navarro* (2006) 138 Cal.App.4th 146, 164, fn. omitted.)

"[T]he [trial] court has the authority to hold an in camera hearing on a proper showing that the hearing is necessary to determine the claim of privilege. [¶] [Evidence Code] [s]ection 915, subdivision (b), provides: 'When a court is ruling on a claim of privilege under Article 9 (commencing with Section 1040) of Chapter 4 (official information and identity of informer) . . . and is unable to do so without requiring disclosure of the information claimed to be privileged, the court may require the person from whom disclosure is sought or the person authorized to claim the privilege, or both, to disclose the information in chambers out of the presence and hearing of all persons except the person authorized to claim the privilege and such other persons as the person authorized to claim the privilege is willing to have present. If the judge determines that the information is privileged, neither he nor any other person may ever disclose, without the consent of a person authorized to permit disclosure, what was disclosed in the course of the proceedings in chambers.' " (*Torres v. Superior Court*, *supra*, 80 Cal.App.4th at p. 873.)

We have reviewed the transcripts of the in camera hearings. Based on that review, we conclude the trial court properly determined that the governmental privilege was properly asserted.

2. *There was sufficient evidence that Gutierrez was guilty of assault with a deadly weapon.*

Gutierrez contends there was insufficient evidence to support his conviction for aiding and abetting Jacobo's assault on Santiago with a deadly weapon – i.e., Santiago's crutch. There is no merit to this claim.

7

a. *Legal principles.*

(1) *Standard of review.*

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" ' [Citation.]" (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

" 'An appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' [Citation.]" (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) As our Supreme Court said in *People v. Rodriguez, supra*, 20 Cal.4th 1, while reversing an insufficient evidence finding because the reviewing court had rejected contrary, but equally logical, inferences the jury might have drawn: "The [Court of

8

Appeal] majority's reasoning . . . amounted to nothing more than a different weighing of the evidence, one the jury might well have considered and rejected. The Attorney General's inferences from the evidence were *no more inherently speculative* than the majority's; consequently, the majority erred in substituting its own assessment of the evidence for that of the jury." (*Id*. at p. 12, italics added.)

(2) *Direct aiding and abetting liability.*

Under California law, all persons involved in the commission of a crime are principals whether they commit the act constituting the offense, or merely aid and abet in its commission. (§ 31.) A direct aider and abettor must act with knowledge of the perpetrator's criminal purpose, with the intent to commit, encourage, or facilitate the commission of the offense, and by an act or advice to aid, promote, encourage, or instigate the commission of that crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 561.) Aiders and abettors share the perpetrator's guilt and criminal liability. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) "[I]n general neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission. [Citations.] However, '[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

b. *Discussion*.

Gutierrez argues there was no evidence he intended "to encourage or facilitate the assault of Santiago," or that "he had any knowledge Jacobo would ever swing a crutch." But this argument is plainly contradicted by the surveillance videotapes, which vividly captured (from several angles) what happened in front of the liquor store when Gutierrez

9

and Jacobo got out of the truck. Initially, Gutierrez and Jacobo both approached Santiago. But when Jacobo began assaulting Santiago, Gutierrez turned toward Ernie – who was standing behind Santiago – and assaulted him. Gutierrez attempted to hit Ernie in the head with a handgun and kicked him, leaving Ernie on the ground. At that point, Gutierrez turned away from Ernie and joined Jacobo in chasing Santiago down the sidewalk. The videotape clearly shows Gutierrez joining the pursuit of Santiago, running just a step or two behind Jacobo as Jacobo chases Santiago while swinging the crutch at him.

Thus, the jury could have reasonably concluded that Gutierrez encouraged and facilitated Jacobo's attack on Santiago by initially subduing Ernie so that Ernie would not be able to come to Santiago's aid, by joining Jacobo as he pursued Santiago down the sidewalk while swinging the crutch at him, and then by fighting with Joel in the street when Joel came to Santiago's aid.

There was ample evidence that Gutierrez aided and abetted Jacobo's assault on Santiago with the crutch.

3. *There was sufficient evidence that Jacobo committed premeditated attempted murder.*

Jacobo contends there was insufficient evidence to sustain his conviction for aiding and abetting Gutierrez's premeditated attempted murder of Joel. We do not agree.

a. *Legal principles.*

(1) *Attempt.*

Section 664 provides: "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts, as follows: [¶] (a) If the crime attempted is . . . . willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole."

10

(2) *Indirect aiding and abetting liability*.

In addition to liability for direct aiding and abetting described in the preceding section, a defendant may also incur indirect aiding and abetting liability under the so-called natural and probable consequences doctrine.

"[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' [Citation.] Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "[A]lthough variations in phrasing are found in decisions addressing the doctrine – 'probable and natural,' 'natural and reasonable,' and 'reasonably foreseeable' – the ultimate factual question is one of foreseeability. [Citations.] 'A natural and probable consequence is a foreseeable consequence' [citation]; the concepts are equivalent in both legal and common usage." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.)

"Aider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature. [Citations.] 'By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime.' [Citation.] [¶] The natural and probable consequences doctrine is based on the principle that liability extends to reach 'the actual, rather than the planned or 'intended' crime, committed on the *policy* [that] . . . aiders and abettors should be responsible for the

11

criminal *harms* they have naturally, probably, and foreseeably put in motion.' [Citations.]  We have never held that the application of the natural and probable consequences doctrine depends on the foreseeability of every element of the nontarget offense.  Rather, in the context of murder under the natural and probable consequences doctrine, cases have focused on the reasonable foreseeability of the actual resulting harm or the criminal act that caused that harm.  [Citations.]"  (*People v. Chiu* (2014) 59 Cal.4th 155, 164-165, fn. omitted.)  "[T]he ultimate factual question is one of reasonable foreseeability, to be evaluated under *all* the factual circumstances of the case.  [Citations.]  The precise consequence need not have been foreseen.  [Citation.]"  (*People v. Medina* (2009) 46 Cal.4th 913, 927.)

The natural and probable consequences doctrine has often been applied in gang fight situations.  "[G]ang violence cases affirming defendants' liability as aiders and abettors [have included the following.]  (*People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 . . . [fatal shooting during gang-related fistfight was natural and probable consequence of fistfight]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056 . . . [shooting of rival gang member during retreat from fight was natural and probable consequence of gang fight in which defendant wielded a chain]; *People v. Olguin* [(1994)] 31 Cal.App.4th [1355,] 1376 . . . [defendant's punching of victim during gang confrontation foreseeably led to fatal shooting of victim by fellow gang member]; *People v. Godinez* [(1992)] 2 Cal.App.4th 492, 499-500 [fatal stabbing of rival gang member either during or after fistfight was natural and probable consequence of fistfight]; *People v. Montano* (1979) 96 Cal.App.3d 221, 226 . . . [defendant's aiding and encouragement of battery on victim foreseeably led to shooting of victim by fellow gang members].)"  (*People v. Medina*, *supra*, 46 Cal.4th at pp. 920-21.)

Moreover, "prior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor.  (*People v. Montes*, *supra*, 74 Cal.App.4th at p. 1056 ['[g]iven the great potential for escalating violence during gang confrontations, it is immaterial whether [defendant] specifically knew [a fellow gang member] had a gun']; *People v. Godinez*, *supra*, 2 Cal.App.4th at p. 501 . . .

12

['although evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of a homicide, it is not a necessary prerequisite']; *People v. Montano*, *supra*, 96 Cal.App.3d at p. 227 [defendant's liability for aiding and abetting attempted murder not dependent on awareness that fellow gang members possessed deadly weapons].)  Likewise, prior gang rivalry, while reflecting motive, is not necessary for a court to uphold a gang member's murder conviction under an aiding and abetting theory.  (See *People v. Olguin*, *supra*, 31 Cal.App.4th at pp. 1382-1383 [gang enhancement upheld even though no evidence of 'prior relationship between the killers and their victim, and *no reason for animosity other than gang-related insults*'].)"  (*People v. Medina*, *supra*, 46 Cal.4th at p. 921, italics added.)

   b. *Discussion*.

  A typical example of natural and probable consequence liability arising out of a gang fight occurred in *People v. Montes*, *supra*, 74 Cal.App.4th 1050, where members of the defendant's gang surrounded the victim in a parking lot.  When the victim, who belonged to a rival gang, brandished a switchblade, Montes hit him with a chain as Montes's fellow gang members closed in.  As a diversion, the victim's companion yelled something about a gun, causing defendant's gang to retreat to their car.  But as the victim and his companion prepared to drive away, Cuevas, a member of Montes's gang, retrieved a gun from a nearby vehicle and shot the victim.  The Court of Appeal held Montes's attempted murder conviction was properly predicated on a natural and probable consequence theory with either simple assault or breach of the peace as the target crime: "As gang expert Nelson explained, these facts represent a textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire.  There can be little question that the target offenses of assault and breach of the peace were closely connected to the shooting." (*Id*. at p. 1055.)  The Court of Appeal reasoned, "When rival gangs clash today, verbal taunting can quickly give way to physical violence and gunfire.  No one immersed in the gang culture is unaware of these realities, and we see no reason the courts should turn a blind eye to them.  Given the great potential for

escalating violence during gang confrontations, it is immaterial whether Montes specifically knew Cuevas had a gun." (*Id*. at p. 1056.)

Here, even without Detective Aguirre's testimony that gang members typically know if fellow gang members are armed, the jury could have found it reasonably foreseeable that a fatal shooting would result when Gutierrez and Jacobo left the truck and began assaulting Santiago and Ernie in response to Santiago's disrespectful conduct. The evidence showed Jacobo had participated in a verbal gang challenge inside the liquor store, and that Jacobo initiated the physical assault against his gang rivals in front of the store. Jacobo then chased after Santiago while beating him with the crutch. Given Aguirre's testimony that gang members who are verbally disrespected on the street are expected to respond with violence, it was reasonably foreseeable that Gutierrez, Jacobo's fellow City Terrace gang member, might end up trying to kill someone in the ensuing melee.

Jacobo asserts *People v. Chiu*, *supra*, 59 Cal.4th 155, held that it is impermissible to base a premeditated attempted murder verdict on the natural and probable consequences doctrine. Not so. *Chiu* held only that "an aider and abettor may not be convicted of first degree *premeditated murder* under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" (*Id*. at pp. 158-159, second italics added.) Jacobo was convicted of premeditated *attempted murder*, not premeditated murder. Our Supreme Court had ruled earlier in *People v. Favor* (2012) 54 Cal.4th 868, 872, that "as to the premeditation allegation under section 664(a), the trial court need only instruct that the jury must find that the commission of attempted murder was a natural and probable consequence of the target crime . . . . It need not instruct that *premeditation* must also be a natural and probable consequence of the [target crime]." *Chiu* emphasized that its analysis regarding first degree murder based on the natural and probable consequences doctrine did not contradict *Favor*'s analysis regarding premeditated attempted murder based on the natural and probable consequences doctrine. (See *Chiu*, *supra*, 59 Cal.4th at p. 163.)

14

Jacobo contends the natural and probable consequences doctrine is unconstitutional[4] because it allowed for his conviction without the prosecution having to prove he was even aware of Gutierrez's intent to kill Joel, much less that he shared Gutierrez's intent and tried to facilitate it. It is clear, however, that "[a] defendant guilty as an aider and abettor under the 'natural and probable consequences' doctrine need not share the perpetrator's intent to kill. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 635, 691.) "Aider and abettor liability under the natural and probable consequences doctrine does not require assistance with or actual knowledge and intent relating to the nontarget offense, nor subjective foreseeability of either that offense or the perpetrator's state of mind in committing it. [Citation.] It only requires that under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the nontarget offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant. [Citation.]" (*People v. Chiu*, *supra*, 59 Cal.4th at pp. 165-166.) "To the extent [defendant] contends that imposition of liability for murder on an aider and abettor under this doctrine violates due process by substituting a presumption for, or otherwise excusing, proof of the required mental state, she is mistaken." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 107.) We are bound by our Supreme Court's opinions in this matter. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In sum, there was sufficient evidence to sustain Jacobo's premeditated attempted murder conviction.

4. *Gang expert testimony was properly admitted*.

Defendants contend the trial court erred by allowing Detective Aguirre, the prosecution gang expert, to give certain testimony. We disagree.

---

[4]    Although Jacobo purports to be contesting the adequacy of two jury instructions – CALCRIM Nos. 402 and 601 – his underlying claim is that convicting him for Joel's shooting on the basis of the natural and probable consequences doctrine was unconstitutional.

Citing *People v. Killebrew* (2002) 103 Cal.App.4th 644 (*Killebrew*), Jacobo asserts that Detective Aguirre should not have been allowed to testify that gang members typically know whether fellow gang members are carrying firearms, and that sometimes gang members have no choice but to assault, shoot, or kill persons being disrespectful to them. Jacobo argues this testimony was *irrelevant* and constituted an improper opinion as to his subjective knowledge and intent, issues that properly should have been reserved for the jury.

In this case, the gang expert testimony was unquestionably relevant. "When offered by the prosecution, we have condemned the introduction of evidence of gang membership if only tangentially relevant, given its highly inflammatory impact." (*People v. Cox* (1991) 53 Cal.3d 618, 660, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) However, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation – including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like – can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *People v. Olguin*, *supra*, 31 Cal.App.4th at p. 1369 ["[e]vidence of gang activity and affiliation is admissible where it is relevant to issues of motive and intent"]; *People v. Avitia* (2005) 127 Cal.App.4th 185, 192 ["Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative."].)

Here, Detective Aguirre's testimony provided the jurors with the information they needed to understand how an apparently innocuous verbal interchange inside the liquor store could have exploded so quickly into the vicious physical assault in front of the store, followed by the shooting of Joel in the intersection. According to the time stamps on the surveillance videotapes, the entire incident – from the moment Jacobo entered the

16

liquor store until Joel left Martha's van and was shot – took only a little more than two minutes.

Jacobo's reliance on *Killebrew* to attack Aguirre's hypothetical-based testimony is misplaced. "A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a 'classic' example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence. [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551, fn. 4.) This is true even if the gang expert's opinion in effect answers an ultimate issue in the case. In *People v. Vang* (2011) 52 Cal.4th 1038, the court stated, "[t]o the extent *Killebrew* . . . purported to condemn the use of hypothetical questions, it overlooked the critical difference between an expert's expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves. *Killebrew* stated that the expert in that case 'simply informed the jury of his belief of the suspects' knowledge and intent on the night in question, issues properly reserved to the trier of fact.' [Citation.] But, to the extent the testimony responds to hypothetical questions, as in this case (and, it appears, in *Killebrew* itself), such testimony does no such thing. Here, the expert gave the opinion that an assault committed in the manner described in the hypothetical question would be gang related. The expert did *not* give an opinion on whether the defendants did commit an assault in that way, and thus did *not* give an opinion on how the jury should decide the case." (*Id.* at pp. 1047-1049, fns. omitted.)[5]

The crucial distinction is the difference between testifying about a particular person's mental state and testifying about the mental states of gang members in general. Here, based on his knowledge of the general habits and culture of gang members, Aguirre properly testified about gang members in general, and he did not offer opinion testimony about the knowledge or intent of defendants in this case. The trial court did not err by admitting his testimony.

---

[5]    Jacobo also cites *In re Frank S.* (2006) 141 Cal.App.4th 1192, but that case was decided by the same Court of Appeal that decided *Killebrew* and used a similar analysis. (*In re Frank S.*, at pp. 1197-1198.)

5. *Trial court properly refused to instruct on voluntary intoxication.*

Jacobo contends the trial court erred by refusing to instruct the jury on the defense of voluntary intoxication, which the jury should have considered in determining his culpability for the charged crimes. We are not persuaded.

Defense counsel for Jacobo asked for a jury instruction on voluntary intoxication, arguing that the surveillance videotape showed Jacobo staggering on his way into the liquor store: "The video shows the defendant staggering. When he gets out of the truck, he misses a step getting out of the truck and appears to be under the influence of an intoxicating substance." At the same time, however, defense counsel acknowledged that there was no evidence Jacobo had consumed any intoxicating substances. The prosecutor responded, "The fact that [defense counsel] can try to construe how the guy walked . . . . It's an opinion by him that this guy looks drunk. But there is no evidence that he drank or was drunk or anything like that." The trial court concluded a voluntary intoxication instruction was not warranted.

Section 29.4, subdivision (b), provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." However, "[a] defendant is entitled to [a voluntary intoxication] instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams*, *supra*, 16 Cal.4th at p. 677; see, e.g., *People v. Seaton* (2001) 26 Cal.4th 598, 666 [although defendant smoked cocaine and drank alcohol, the evidence "did not strongly suggest [these intoxicating substances] prevented him from forming the intent to commit these crimes"]; *People v. Williams*, *supra*, at p. 678 ["no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent"]; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1181 [no evidence defendant's beer drinking "had any noticeable effect on his mental state or actions"].)

18

We have viewed the videotape and, frankly, we do not see Jacobo stumble when he gets out of the truck. And even if we did, there was absolutely no evidence at trial demonstrating that the stumble had been caused by an intoxicating substance that also distorted Jacobo's thought processes.

The trial court did not err by refusing to instruct the jury on voluntary intoxication.

6. *Trial court properly refused to instruct on attempted involuntary manslaughter.*

Jacobo contends the trial court erred by not instructing the jury, sua sponte, on attempted involuntary manslaughter as a lesser included offense of attempted murder. There is no merit to this claim.

"In a number of instances, courts have held that because an attempt requires that a defendant act with the specific intent to commit the attempted crime, 'a defendant cannot be convicted of attempting to commit a substantive crime that by definition must be committed unintentionally.' (1 Witkin & Epstein, *supra,* Elements, § 53, p. 263, italics omitted.) For example, the Court of Appeal in *People v. Broussard* (1977) 76 Cal.App.3d 193, 197 . . . concluded that because the crime of involuntary manslaughter by definition involves an unintentional killing, an attempt to commit that crime 'would require that the defendant intend to perpetrate an unintentional killing – a logical impossibility,' and accordingly held that there is no crime of attempted involuntary manslaughter. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 232, fn. 7.) We ourselves have held that "there can be no crime of *attempted involuntary manslaughter.*" (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 54, fn. 12; accord *People v. Gutierrez* (2003) 112 Cal.App.4th 704, 710; *People v. Post* (2001) 94 Cal.App.4th 467, 481; *People v. Johnson* (1996) 51 Cal.App.4th 1329, 1332.)

The trial court did not err by failing to instruct the jury on attempted involuntary manslaughter.

7. *Trial court properly refused to instruct on attempted voluntary manslaughter.*

Defendants contend the trial court erred by refusing their request to instruct the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. We do not agree.

19

a. *Background*.

At the jury instruction conference, the defense attorneys asked for attempted voluntary manslaughter instructions based on theories of imperfect self-defense and heat of passion/sudden quarrel. Counsel argued that Martha's testimony[6] demonstrated there had been two separate fights: an initial altercation between Jacobo and Santiago that ended when Santiago ran back to the van; and then, a second altercation that occurred when Joel left the van and started fighting with Gutierrez. Defense counsel argued that, according to this evidence, Gutierrez had merely been defending himself when he shot Joel.

The prosecutor disagreed, arguing the defendants had been the aggressors throughout the entire incident and that there was no evidence of sufficient provocation by the victims. The prosecutor also argued there was no evidence Gutierrez ever believed he was in imminent danger.

The trial court agreed with the prosecutor and refused to give the requested instructions. The court concluded there was no evidence of sufficient provocation, and no evidence that Gutierrez actually believed he was in danger: "There was zero evidence that the defendant believed that he was in imminent danger of being killed or suffering great bodily injury. There is zero evidence that the defendant believed that the use of deadly force was necessary to defend." The court also stated, "This is not a heat of passion case."

b. *Legal principles*.

"When there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of a lesser included offense, the court must instruct upon the lesser included offense, and must allow the jury to return the lesser conviction, even if not requested to do so. [Citations.]" (*People v. Webster* (1991) 54 Cal.3d 411, 443.) In this context, "substantial evidence" is evidence from which reasonable jurors

---

**6**    Martha testified at one point that Santiago "ran inside the van, and that's when my husband Joel, he came out fighting . . . ." Nevertheless, the implication that Joel did not leave the van until after Santiago got back in is refuted by the surveillance videotapes.

could conclude the lesser offense, but not the greater, had been committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)

"An intentional, unlawful homicide is 'upon a sudden quarrel or heat of passion' (§ 192(a)), and is thus voluntary manslaughter [citation], if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' [Citations.] ' "[N]o specific type of provocation [is] required . . . " ' [Citation.] Moreover, the passion aroused need not be anger or rage, but can be any ' " '[v]iolent, intense, high-wrought or enthusiastic emotion' " ' [citation] other than revenge [citation]." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 163.)

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) "[T]he doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*" ' . . . [¶] We also emphasize that whether the defendant actually held the required belief is to be determined by the trier of fact based on all the relevant facts. It is not required to accept the defendant's bare assertion of such a fear. . . . Finally, we reiterate that, just as with perfect self-defense or any defense, '[a] trial court need give a requested instruction concerning a defense *only if there is substantial evidence to support the defense*.' [Citation.]" (*Id*. at p. 783.)

            c. *Discussion.*

The trial court correctly decided that Gutierrez was not entitled to either an imperfect self-defense attempted voluntary manslaughter instruction, or a heat-of-passion attempted voluntary manslaughter instruction, with respect to the shooting of Joel.

21

(1) *Imperfect self-defense instruction properly refused.*

"It is well established that the ordinary self-defense doctrine – applicable when a defendant *reasonably* believes that his safety is endangered – may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citation.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*In re Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.)

The evidence demonstrated that it was the defendants who initiated the violent melee – when Jacobo punched Santiago while Gutierrez attacked Ernie – which directly led, about 15 seconds later, to Joel's shooting after he left the van to protect Santiago from defendants' attack. The defendants' concerted action reasonably implies they had a common purpose, which Gutierrez manifested when he joined Jacobo in chasing Santiago after having knocked Ernie to the ground. Thus, as to both defendants, Joel's bystander intervention was a reasonably expected occurrence and Gutierrez cannot invoke the imperfect self-defense doctrine. (See *People v. Seaton*, *supra*, 26 Cal.4th at p. 664 [no evidence supported imperfect self-defense because "defendant's testimony showed him to be the initial aggressor and the victim's response legally justified"]; *People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180 [imperfect self-defense inapplicable if defendant "creates circumstances where the victim is *legally* justified in resorting to self-defense"].)

A separate reason for refusing to instruct the jury on imperfect self-defense was the absence of any evidence showing that Gutierrez "*actually* . . . believed he was in imminent danger of death or great bodily injury" when he shot Joel. (*In re Christian S.*, *supra*, 7 Cal.4th at p. 771; see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [defendant claiming self-defense must " ' "prove his own frame of mind" ' "].) There was no evidence that Gutierrez shot Joel because he was afraid of him.

In sum, we conclude the trial court properly refused to instruct the jury on imperfect self-defense attempted voluntary manslaughter because there was no

substantial evidence to support this theory.  (See *In re Christian S.*, *supra*, 7 Cal.4th at p. 783.)

## (2)  *Heat-of-passion instruction properly refused.*

We find the trial court properly refused to instruct on heat-of-passion attempted voluntary manslaughter because, even assuming arguendo that Gutierrez's reason had been obscured by strong passion, there was no evidence this passion had been aroused by a legally sufficient cause.  (See *People v. Pride* (1992) 3 Cal.4th 195, 250 [some evidence may, as matter of law, be insufficient to arouse homicidal rage or passion in a reasonable person]; *People v. Wickersham* (1982) 32 Cal.3d 307, 326, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201 [" ' "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man" ' "].)

It is a general rule that adequate provocation cannot be based on mere hard looks and taunting words.  (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 826 ["voluntary manslaughter instruction is not warranted where the act that allegedly provoked the killing was no more than taunting words, a technical battery, or slight touching"]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [calling defendant a " 'mother fucker,' " and daring him to use his weapon if he had one, "plainly were insufficient to cause an average person to become so inflamed as to lose reason and judgment"]; *People v. Lucas* (1997) 55 Cal.App.4th 721, 740 [receiving hard looks or so-called "mad-dogging" does not constitute reasonable provocation to shoot someone].)  This rule does not change just because Gutierrez belonged to a gang.  (Cf. *People v. Humphrey* (1996) 13 Cal.4th 1073, 1087 [indicating disapproval of a reasonable gang member standard:  "Contrary to the Attorney General's argument, we are not changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard.  Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' "].)  Gutierrez's gang-based reasons for

assaulting the victims in this case cannot provide the reasonable provocation needed to justify a heat-of-passion defense.

Furthermore, it is well-established that predictable conduct by a resisting victim does not constitute sufficient provocation to warrant a heat-of-passion defense. (See *People v. Rich* (1988) 45 Cal.3d 1036, 1112 [resistance by rape victim]; *People v. Jackson* (1980) 28 Cal.3d 264, 306, disapproved on another ground in *People v. Cromer* (2001) 24 Cal.4th 889, 901, fn. 3 ["defendant may have become enraged and brutally attacked and killed one of his elderly victims because she awakened during the burglary and began to scream"].) We cannot see why this rule would not apply to Gutierrez's act of shooting at Joel, whose intervention to rescue his son was just as predictable as the actions of a classic "resisting victim."

The trial court properly refused to instruct the jury on heat-of-passion attempted voluntary manslaughter.

**DISPOSITION**

The judgments are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.

25